**In re Vincent J. PAPPALARDO, Debtor.**

**Bankruptcy No. 95–30023–BKC–PGH.**

United States Bankruptcy Court,
S.D. Florida.

May 19, 1997.

Diane Noller Wells, Miami, FL.

Patrick Barry, Ft. Lauderdale, FL.

Larry Teirger, Atlanta, GA.

Ramona Elliot, Assistant United States Trustee.

Mario Delgado, Miami, FL.

Jeffrey Frank, Palm Beach Gardens, FL.

## MEMORANDUM DECISION AND ORDER GRANTING MOTION OF JOHN D. AND CATHERINE T. MACARTHUR FOUNDATION FOR ENLARGEMENT OF TIME TO FILE A PROOF OF CLAIM

PAUL G. HYMAN, Jr., Bankruptcy Judge.

**THIS MATTER** came before the Court for final hearing on December 18, 1996, on the John D. and Catherine T. MacArthur Foundation's (the "Foundation") Motion for Enlargement of Time to File a Proof of Claim and for Order Accepting Claim as Timely Filed (the "Foundation's Motion") and the objections thereto. The Foundation seeks permission to file a $4,000,000.00 unsecured claim (the "Foundation's Claim") almost 7 months after the claims bar date. The Court, having heard the testimony, examined the evidence presented, observed the candor and demeanor of the witnesses, and considered the arguments of counsel, makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

#### A. PROCEDURAL HISTORY PRIOR TO THE FILING OF THE FOUNDATION'S MOTION.

Prior to the filing of the Foundation's Motion, this case was commenced by the filing of a voluntary Chapter 11 petition on January 3, 1995, by Vincent J. Pappalardo (the "Debtor"). Initially the Debtor had failed to file certain schedules with his petition. The missing schedules were subsequently filed on February 2, 1995. However, these schedules did not list the Foundation or Community Savings, F.A. ("Community Savings") as creditors. The Foundation and Community Savings were also not listed on the Debtor's original creditor matrix. On February 2, 1995, the Clerk of the Bankruptcy Court (the "Clerk") served a Notice of Commencement of the Case, Meeting of Creditors, and Fixing of Dates (the "341 Notice") on all creditors listed on the Debtor's original matrix. However, because neither Community Savings nor the Foundation had appeared on the Debtor's original matrix, the 341 Notice was not served on either creditor by the Clerk. The 341 Notice set the bar date for filing proofs of claims as May 24, 1995 (the "Claims Bar Date"). The 341 Notice also set the first meeting of creditors for February 23, 1995, and informed creditors that "case filing information and deadline dates can be obtained free of charge by calling our Voice Case Information System: (305) 536–5979, (305) 536–5696 or (800) 473–0226."

On March 3, 1995, after the first meeting of creditors, the Debtor filed an Amendment To Petition and Schedules (the "Amendment"). The Amendment added the Foundation and Community Savings as creditors. The Debtor also added the Foundation and Community Savings to his creditor matrix. The Amendment reflected the Foundation as the holder of a disputed unsecured claim in the amount of $2,000,000.00.

The Foundation did not attend the Debtor's first meeting of creditors nor did it file a proof of claim by the Claims Bar Date. The Debtor filed his initial Disclosure Statement and Plan of Reorganization on December 7, 1995 (the "Initial Plan"). Set forth in the Disclosure Statement was the statement that the Foundation would not receive any distribution or dividend under the Initial Plan because its claim had been disputed and the Foundation had failed to file a proof of claim. On December 12, 1995, the Foundation filed (a) a Notice of Appearance; (b) the Foundation's Claim; and (c) the Foundation's Motion. On December 15, 1995, the Debtor filed a Response And Objection to the Foundation's Motion. On December 28, 1995, the

Federal Deposit Insurance Corporation, as Receiver for First American Bank & Trust (the "FDIC"), filed its objection to the Foundation's Motion.

## B. THE FOUNDATION'S CLAIM

The Debtor was a well-known local real estate developer and builder in Palm Beach County, Florida. Through several affiliated companies, the Debtor constructed and developed a number of large commercial real estate projects. Articles were often published in the Palm Beach County newspaper about the Debtor and the financial difficulties related to various failed real estate projects. One failed project included a hotel and office building complex located at the intersection of I–95 and PGA Boulevard (the "Admiralty Property"). The Foundation was the fee title holder to the original vacant land upon which the Admiralty Property was built.

The Foundation had entered into a long-term lease with an affiliate of the Debtor for development of the Admiralty Property. Financing was provided by Michigan National Bank (the "Bank") and the Foundation subordinated its fee interest in the Admiralty Property to the Bank's mortgage. The Debtor personally guaranteed the lease payments to the Foundation. A default occurred under the ground lease and leasehold mortgage thereby obligating the Debtor to fulfill his obligations under the Guaranty. This Guaranty is the basis for the Foundation's Claim.

In 1992, a foreclosure action was filed by the Bank in state court against *inter alia*, the Debtor, Pappalardo Properties, and the Foundation (the "Foreclosure Action"). In the summer of 1994, the Bank settled with the Foundation and the Foundation moved its headquarters into the 10–story office building on the Admiralty Property. In late 1994, a judgment of foreclosure was entered in favor of the Bank. Rimco XII, Inc. ("Rimco") is an affiliate of the Bank and the assignee of the Bank's unsecured claim against the Debtor. Rimco later purchased the assets subject to the lien at a foreclosure sale. On the Debtor's petition date, an appeal of the foreclosure judgment was pending before the Florida Fourth District Court of Appeals.

## C. THE EVENTS LEADING TO THE FILING OF THE FOUNDATION'S CLAIM.

**1. The Foundation learned of the Debtor's bankruptcy filing prior to the Claims Bar Date.**

Throughout his case, the Debtor has been represented by Jeffrey H. Frank of Levine, Frank, Edgar & Telepman. Mr. Frank is an experienced bankruptcy lawyer who practices almost exclusively in the Southern District of Florida. Mr. Frank was aware of the Foreclosure Action at the time he filed the Debtor's petition. However, Mr. Frank never filed a suggestion of bankruptcy in the Foreclosure Action even though the Debtor's original schedules listed the Foreclosure Action. In addition, Mr. Frank did not include the Foundation in the Debtor's original creditor matrix or schedules.

As indicated above, the first meeting of creditors occurred on February 24, 1995, and neither the Foundation nor Community Savings attended. The 341 Meeting was attended by Patrick A. Barry, an attorney for Rimco and the Bank. Mr. Barry questioned the Debtor regarding the Foundation's Claim and inquired as to why it had not been listed as a creditor on the Debtor's schedules.

After the first meeting of creditors, the Debtor filed the Amendment which added the Foundation and Community Savings as creditors. The Amendment's certificate of service, signed by Mr. Frank, verifies that the Amendment was served on the two creditors on February 28, 1995. Community Savings's attorney, Freeman Barner, received and date stamped the Amendment on March 2, 1995. The Clerk received the Amendment on March 3, 1995. The Foundation could not produce a date stamped copy of the Amendment. On April 28, 1995, the Clerk mailed the Amendment to all creditors including the Foundation.

The Foundation claims that it did not learn of the Debtor's bankruptcy case until March 1995 notwithstanding the fact that Debtor's bankruptcy was reported in an extensive newspaper article in the business section of the *Palm Beach Post* on January 14, 1995,

and the Foundation subscribed to the *Palm Beach Post* for its Florida and Chicago offices. In addition, it was established that individual employees had copies of the *Palm Beach Post* delivered to them at the Florida office; it was the practice and custom of the Foundation to circulate selected articles from the *Palm Beach Post* relating to Florida real estate; and the January 14, 1995, article referred to the Admiralty Property, which was by then Foundation's Florida headquarters. Nevertheless, it was not conclusively established that the Foundation had knowledge of the Debtor's bankruptcy prior to the first week of March 1995.

The Court finds that the Foundation learned of the Debtor's bankruptcy prior to the Claims Bar Date. Starting in March 1995 the Foundation began receiving bankruptcy pleadings, documents, and notices mailed to all parties on the Debtor's amended creditor matrix. The pleadings were sent to the Foundation at its Florida headquarters at the Admiralty Property and were being routed to Steve Cohen, the Foundation's senior attorney in Florida, whose office was in the building.

In early March 1995, the Foundation received a copy of a Motion To Assume Lease. Mr. Cohen, testified that on March 8, 1995, he received the Motion To Assume Lease and faxed it to Skip Smith, the Foundation's outside counsel in the Foreclosure Action.

The Foundation also learned of the Debtor's bankruptcy when it received a copy of the Amendment from the Clerk sometime in either late April or early May 1995. Although the Foundation could not produce a date stamped copy of the Amendment, Mr. Cohen testified that he had received the Amendment sometime after he had received the Motion to Assume Lease. Mr. Cohen wrote on the top left-hand corner of the first page of the Amendment follow up tickler dates—including the need to file a proof of claim. Mr. Cohen also circled the amount of the Foundation claim on page 2 of the Amendment and noted that the Debtor had shown the claim as disputed.

In addition to the foregoing, the Foundation received a Motion To Extend Exclusivity with its corresponding notice of hearing.

The Motion To Extend Exclusivity was received on April 28, 1995. The Foundation received this Court's Order Granting the Motion To Extend Exclusivity and sent it to Josh Mintz, the Foundation's General Counsel, in Chicago via Federal Express. Mr. Mintz received the order on May 5, 1995.

The Foundation also received a copy of a Joint Motion to Approve Settlement and Compromise wherein the Debtor sought to settle and compromise the claims of Admiralty Bank and the Bank on April 28, 1995. It set forth specific details regarding the claims including the Florida Fourth District Court of Appeals' affirmance of the foreclosure litigation on Admiralty Property. The Joint Motion to Approve the Settlement and Compromise also included the assertion that the Debtor had negotiated an extremely favorable settlement which would allow the Debtor to propose a Plan of Reorganization that would likely be confirmed.

2. **The 341 Notice was not served on the creditors omitted from the Debtor's initial schedules.**

As indicated above, the 341 Notice contained the Claims Bar Date. The Debtor's counsel, Mr. Frank, gave inconsistent testimony concerning his practice with respect to service of a 341 Notice. At his deposition, Mr. Frank testified that it was his practice not to serve the Amendment on creditors who were added after the 341 meeting had already occurred. Mr. Frank stated at his deposition that he considered it unnecessary and "academic" to serve the § 341 Notice on new creditors that were added after the 341 meeting had already occurred. However, at trial, Mr. Frank claimed that he does serve the 341 Notice with all amendments adding creditors. In response to questions from the Court, Mr. Frank pointed to the Certificate of Service on the bottom of the Amendment as proof that the Debtor served the 341 Notice on the Foundation.

The Certificate of Service does not specifically state that the 341 Notice was served but instead states:

a true and correct copy of the foregoing has been furnished this 28th day of Febru-

ary, 1995 to Community Savings, F.A., c/o Freeman Barner, Jr., Esquire, 631 U.S. Highway One, Suite #410, North Palm Beach, FL 33408; and the U.S. Trustee, 1204 Federal Building, 51 S.W. First Avenue, Miami, FL 33130 by U.S. Mail. + Catherine & John D. MacArthur Foundation.[1]

Mr. Frank and Carol Hardy, his legal assistant, both admitted that the Certificate of Service introduced into evidence was a boilerplate, pre-prepared form that is not changed regardless of the nature of the document or pleading served. Ms. Hardy testified that a similar pre-prepared certificate of service was used when other creditors were subsequently added to the Debtor's case. In addition, she stated that the pre-prepared certificate of service is used whether or not a 341 Notice is actually served. Finally, neither Mr. Frank, nor Ms. Hardy, have any specific recollection of serving the Foundation with the 341 Notice.

Several of the Foundation witnesses testified that the Foundation had not received the 341 Notice prior to November 1995 and that a copy of the 341 Notice was not in the Foundation's files in Chicago or Florida prior to the Foundation's discovery of the Claims Bar Date in September 1995. The testimony of the Foundation's witnesses is supported by the testimony of Freeman Barner, the attorney for Community Savings. Mr. Barner testified that he did not receive the 341 Notice prior to the Claims Bar Date. As indicated above, the Clerk did not serve a copy of the 341 Notice on the Foundation since it was not listed on the Debtor's original creditor matrix. Based upon the evidence introduced at trial, the Count finds that the 341 Notice was not served upon the Foundation.

### 3. The Foundation attempts to ascertain the Claims Bar Date after it learned of the Debtor's bankruptcy filing.

Sometime in March 1995, Mr. Cohen communicated to Mr. Mintz in Chicago that the Debtor had filed a Chapter 11 bankruptcy

case in the Southern District of Florida. Mr. Mintz instructed Mr. Cohen to send copies of all bankruptcy pleadings to Mr. Mintz's office in Chicago for review.

Mr. Mintz was hired by the Foundation in March 1994 to serve as its General Counsel. Mr. Mintz had been a partner with the Foundation's outside law firm, Sidley & Austin, in Chicago. Mr. Mintz was an experienced practitioner who specialized in bankruptcy law. Nancy Rinder, Mr. Mintz's legal assistant at the Foundation, had also worked at Sidley & Austin with Mr. Mintz in the corporate reorganization and bankruptcy group. During 1993, Mr. Mintz had represented the Foundation in other cases pending in the Bankruptcy Court in the Southern District of Florida. Shortly after Mr. Mintz joined the Foundation, he became personally involved in the settlement negotiations between the Foundation against the Bank over the Admiralty Property.

In the last week of March or early April 1995, Mr. Mintz informed Ms. Rinder that she would be responsible for preparing a proof of claim and determining whether a claims bar date had been set. At that time, Mr. Mintz was aware that the only bankruptcy pleadings that the Foundation had in its possession were the ones that had been received by Mr. Cohen beginning in March 1995 and they did not include any before that date. He did not request that Ms. Rinder perform a search to determine what bankruptcy pleadings had been filed prior to March 1995 although Mr. Mintz was aware that there could be additional Bankruptcy Court pleadings that were being filed and circulated among the attorneys of record but not mailed to the general creditor list. Mr. Mintz also testified that he never asked Ms. Rinder to get a copy of the Bankruptcy Court docket sheet so he could review it nor did he advise her to obtain a copy of the 341 Notice.

Mr. Mintz testified that he was attempting to limit his involvement in the bankruptcy proceedings to filing a proof of claim, which would be handled in-house, and he had not

---

1. The certificate of service is typed with the exception of the words "Catherine and John D. MacArthur Foundation" which is handwritten at the end of the typewritten text. There is no address listed for the MacArthur Foundation.

determined how involved the Foundation would get in the bankruptcy proceeding because he was concerned about the expenses involved. Although the Foundation had a substantial claim, Mr. Mintz never made any inquiry as to whether there was an unsecured creditors' committee appointed in the case or whether the First Meeting of Creditors had been held. Mr. Mintz testified he was not particularly concerned about determining when the First Meeting of Creditors was in the case and he was aware that the first meeting is held no fewer than 20 or more than 40 days after the Order for relief in a Chapter 11.

Mr. Mintz testified that:

my main concern was to have a proof of claim on file within the bar date that might have been set by the Court, and then I would make a determination, based upon having filed the Proof of Claim, as the events proceeded, whether it made sense to hire outside counsel and get more in-

volved in the case, which carried with it a degree of expense.

Ms. Rinder testified two separate times before the Court regarding her efforts to learn about the Claims Bar Date. Initially, Ms. Rinder testified that she called the Bankruptcy Clerk of the Court's Office (the "Clerk's Office") in Miami in early May 1995 to determine whether a claims bar date had been set. She testified that she was referred to the Voice Case Information System (the "VCIS") for information on case deadlines.[2] Ms. Rinder claimed that she made numerous attempts that day to reach the VCIS but was unable to get through so she called the Clerk's Office again and spoke with an unidentified person. The unidentified person in the Clerk's Office told her that the Claims Bar Date had not been set. According to Ms. Rinder, her next attempt to learn the Claims Bar Date was at the end of June 1995. At that time, she called the VCIS and the tape did not contain any information concerning the Claims Bar Date. Ms. Rinder

2. The Court called, as the Court's witness, Katherine Gould Feldman, the Chief Deputy Clerk for the Bankruptcy Court. Ms. Feldman described the workings of the VCIS and two other information systems used by the Clerk's Office, PACER and BANCAP. She described how information was put into the systems and testified about the docketing of court papers in this case.

The Bankruptcy Court has an automated case processing system which is referred to as BANCAP. BANCAP stands for Bankruptcy Court Automation Program. It is a nationwide program developed by the administrative office in Washington, D.C. for all bankruptcy courts. The actual BANCAP entries are made by personnel in the local bankruptcy offices.

BANCAP feeds two public access systems. The first is the VCIS which is a general case information program that gives case information and status over the telephone. The VCIS allows access to the court's data base for basic case information by touch-tone telephone by calling a toll-free 1–800 telephone number that appears on the 341 Notice. The second system fed by BANCAP is PACER, which stands for Public Access to Court Electronic Records. PACER is electronically accessed by dialing in through a computer and telephone line directly into the court docket. Information from BANCAP is fed overnight into PACER and the VCIS after the information is entered in BANCAP. Therefore, a docket entry in BANCAP would be reported on PACER and the VCIS the next day.

The VCIS provides the file date and the Chapter of the case, whether it is a consumer or a business filing, whether the filing was voluntary

or involuntary, whether it is an asset or no asset case, the attorney for the debtor and the attorney's phone number, the assigned judge, the status of the case, the 341 scheduled date and location, and the claims bar date. If the case has been set for a first meeting, then the VCIS will provide the first meeting date and a location. If the first meeting date has expired, the system will report, depending on the Chapter, whether the case is awaiting closing or awaiting confirmation. The system will not provide expired dates and deadlines. Therefore, if a claims bar date has passed, it will not be available on the VCIS.

The VCIS recording indicates that if the caller needs additional information then the Clerk's Office should be contacted. All staff members of the Clerk's Office are instructed to follow certain written procedures established by the Clerk of the Court when responding to requests for information. The clerks are instructed to only give out basic case information that is attainable through the BANCAP system. This information is essentially the same information available to the public through PACER and would include date of the § 341 meeting and the claims bar date.

Ms. Feldman testified that based upon her examination of the files and the transaction log, the Claims Bar Date was in the VCIS from the date it was established until the date it expired. She further testified that the Claims Bar Date would also have been available on PACER and available to any clerk in the Clerk's Office on BANCAP even after the Claims Bar Date had passed.

testified that she called the VCIS again in late July 1995 and that it did not contain any information concerning the Claims Bar Date. In August 1995, Ms. Rinder called the VCIS and became concerned when there was no information on the tape about a Claims Bar Date including whether it had been set or whether it had expired. As a result, Ms. Rinder testified that she called the Clerk's Office and spoke with an unidentified person who said that if the VCIS did not have a claims bar date, the date had not been set. Ms. Rinder then testified that on September 22, 1995, she called the Clerk's office again and spoke with Michael Floyd, a supervisor, who told her that the Claims Bar Date had been May 24, 1995, and that because it had passed, it would not have been on the VCIS. Ms. Rinder testified that she immediately notified Mr. Mintz that the Claims Bar Date had been May 24, 1995.

Ms. Rinder's was recalled to identify telephone records concerning her calls to the Clerk's Office and to testify regarding the discrepancies between the Foundation's telephone records and the dates she had given as part of her earlier testimony.[3] After her memory was refreshed by the telephone records, Ms. Rinder admitted that she had been confused in her prior testimony and that her first conversation with the Clerk's Office occurred on April 20, 1995. Ms. Rinder also corrected her testimony with respect to the conversation in late August 1995 when she testified that she had spoken with an unidentified person in the Clerk's Office and was told that if the tape did not contain a claims bar date, then the claims bar date had not been set. Ms. Rinder testified that the second conversation actually occurred on June 27, 1995, and not late August. A note taken by Ms. Rinder on June 27, 1995, was introduced into evidence. The note stated "no bar date as of 6/27/95 (per recording)" which was consistent with the other information known by the Foundation at the time. She also testified that the call in August was only to the VCIS and she did not speak with anyone in the Clerk's Office.

Despite the inconsistency in her testimony, the Court finds that Ms. Rinder was a credible witness and that she clearly made several good faith attempts to ascertain the Claims Bar Date. The Court finds that the discrepancy in Ms. Rinder's testimony is insignificant because irrespective of whether the second conversation took place in June or August 1995, it was consistent with the Foundation's state of mind at both times that no claims bar date had been set.

Both Mr. Mintz and Ms. Rinder testified that they believed, from at least late April 1995 forward, the Foundation would be included as a creditor and would receive notice of the Claims Bar Date based upon the Foundation's receipt of the Amendment, the fact that the Foundation had been told that the Claims Bar Date had not been set, and its receipt of other relevant court pleadings. Because the Clerk's Office had advised Ms. Rinder during the same time period that there was no pending Claims Bar Date, Ms. Rinder anticipated that any notice setting a Claims Bar Date would be included in pleadings served upon the Foundation.

The evidence presented to the Court also shows that while Ms. Rinder was attempting to learn of the Claims Bar Date various attorneys and employees at the Foundation had several electronic mail discussions regarding the Debtor's bankruptcy filing. Several of the discussions included the Foundation's outside counsel, Culver Smith, a partner with the law firm of Jones Foster. The evidence indicated that Jones Foster billed the Foundation in June 1995 for legal services rendered in connection with its determination that there was no statute of limitations problem with respect to the Foundation's Claim.

On May 9, 1995, Mr. Cohen sent an e-mail to Josh Mintz and a carbon copy to Nancy Rinder asking "Are we doing anything about the Pappalardo bankruptcy? I am sending you some additional pleadings in this case" and the next day, he sent a copy of the Debtor's guaranty to Ms. Rinder. On June 12, 1995, an e-mail was exchanged between

---

3. The telephone records of the Foundation only show the dates that toll calls were made from the Foundation's Chicago office to the Clerk's Office. The records do not reflect who at the Foundation made the toll calls or any calls to the toll-free VCIS number.

Josh Mintz, Steven Cohen and Culver Smith that said,

> Skip: Next question is: Is there any reason not to file a claim against Pappalardo in the Bankruptcy case? This should be a particular concern to us now that Pappalardo has filed a $20 million law suit against one of his consultants. At least in theory, this law suit represents a potential asset of Pappalardo—SC.

Mr. Mintz responded that by filing a claim, the Foundation would be submitting itself to Bankruptcy Court jurisdiction.

On June 12, 1995, Culver Smith sent an e-mail to Josh Mintz and Steven Cohen, which said that there was "no downside in filing a claim, except the possible waste of time and money". On June 13, 1995, the senior executive in Florida, Dale Smith, asked "Is there a potential for a counterclaim of any kind [if we file a proof of claim]?" On June 28, 1995, Mr. Cohen sent Ms. Rinder an e-mail asking "Did we ever file a creditors claim?" Finally, on July 14, 1995, Culver Smith asked Ms. Rinder "have we sent everything that you and Josh need regarding the Pappalardo guaranty and the perspective bankruptcy claim? Is there anything that you wish us to do at this end regarding the claim itself?"

During this time period Ms. Rinder periodically provided status reports to Mr. Mintz regarding her efforts to learn of the Claims Bar Date. The information given to Mr. Mintz by Ms. Rinder was consistent with Mr. Mintz's understanding of the case based upon his receipt of pleadings—i.e. that no bar date had yet been set—since, in Mr. Mintz's experience as a bankruptcy lawyer, it was standard practice for a creditor to be given advance written notice of a claims bar date.

### 4. Steps taken by the Foundation after it learned that the Claims Bar Date had passed.

After learning that the Claims Bar Date had passed, Mr. Mintz first requested another review of the pleadings by the Florida and Chicago offices to confirm whether any notice of the Claims Bar Date had been received. Mr. Mintz also attempted to contact Diane Wells, a member of the Florida law firm Steel Hector & Davis ("SHD"), on either September 22 or 23, 1995. When he was unable to reach her, he was transferred to the extension of John Little, another attorney at SHD who had previously represented the Foundation. Unable to reach John Little, Mr. Mintz left a voice mail message for him requesting a copy of the docket sheet for the Debtor's bankruptcy case. Mr. Little subsequently faxed a copy of a partial docket sheet on October 4, 1995, however, Mr. Mintz did not see the docket sheet until October 10, 1995, due to intervening religious holidays, the birth of his daughter, and business travel. The partial docket sheet was printed from SHD's on-line connection with the Clerk's Office for the Southern District of Florida. The partial docket sheet confirmed that the Claims Bar Date had been May 24, 1995.

Mr. Mintz initially contemplated preparing the pleadings concerning the filing of the Foundation's Claim himself, since he believed he was the most knowledgeable of the facts and because of his experience as a bankruptcy lawyer. To that end, Mr. Mintz decided to gather additional information concerning the Debtor's case from the official Court file. Since the Foundation still had not received or reviewed an actual notice of the Claims Bar Date, Mr. Mintz testified that he believed it was particularly important for the Foundation to review the actual notice containing the Claims Bar Date so as to present the strongest motion possible. He also believed it was necessary for the Foundation to determine whether certain conditions had occurred that would trigger or reduce the Guaranty liability, when the defaults had occurred, and the precise amount of the Debtor's liability. Mr. Mintz considered using a special form he had used while at Sidley & Austin, but after Ms. Rinder prepared the draft, Mr. Mintz decided to use the Court's form.

During the fourth week of October, Mr. Mintz contacted Ms. Wells and requested that she obtain the entire docket sheet and other documents from the Court file, including the Claims Bar Date notification. The next day, Ms. Wells received a copy of the complete docket sheet from Pacific Photo, the Court's official copy service. Ms. Wells

reviewed the docket sheet, realized a 341 Notice had been issued, and noted that it was missing from her copy of the Court file. She called Pacific Photo and asked it to obtain a copy of the 341 Notice from the Court file. Each week thereafter Ms. Wells contacted Pacific Photo to see if it had obtained the 341 Notice and was told by Pacific Photo that it was unable obtain a copy because the court files were in the Judge's chambers. On November 20, 1995, Ms. Wells contacted the Judge's secretary and obtained a copy of the 341 Notice from the Court file the same day. Ms. Wells immediately forwarded it to Mr. Mintz, along with a complete copy of the docket sheet in the case.

Upon receiving the 341 Notice and the docket sheet Mr. Mintz concluded that his responsibilities as General Counsel would not permit him to prepare the pleadings concerning the Foundation's Claim. On November 20, 1995, he asked Ms. Wells to file any appropriate pleadings with the Court. Mr. Mintz testified that to the best of his recollection the first time he recalled instructing SHD to prepare to file a motion to file a late proof of claim was on November 20, 1995. Coincidentally, on November 20, 1995, Steven Cohen sent a memorandum to Josh Mintz stating, "Have we decided to abandon the claim against Pappalardo? Should I continue to forward these pleadings to you." On November 28, 1995, Steven Cohen made the following hand-written notation on the memorandum to Josh Mintz, "To File—Per Nancy Rinder, Josh says that no decision has been made. Continue to forward pleadings."

On December 4 or 5, 1995, SHD forwarded a draft of the Foundation's Motion to Mr. Mintz for review. The Foundation's Motion was finalized and was served on all creditors on or about December 8, 1995, together with the Foundation's Claim. However, the Foundation's Motion and the Foundation's Claim were not filed with the Court until Monday, December 12, 1995, because Ms. Wells' office, which is located in Miami, missed the Friday night courier to Ft. Lauderdale. At the time the Foundation filed the Foundation's Motion, it was not aware of the filing of the Debtor's Initial Plan and Disclosure Statement.

**5. Events after the Foundation filed its Motion For Enlargement of Time.**

During the Spring and early Summer of 1996, after discovery had commenced on the Foundation's Motion, the Debtor, FDIC and Foundation attempted to resolve the issue of whether the Foundation's Claim would be allowed, and if so, the amount of the claim. In February 1996 a hearing was held on the Debtor's initial Disclosure Statement. Due to certain unresolved issues, including the Foundation's Motion, the Debtor advised the Court that he anticipated filing an amended plan incorporating a settlement of the Foundation's Motion. In April 1996, a Stipulation With Respect to the Foundation's Motion (the "Stipulation") was executed in an attempt to resolve the matter. The Debtor incorporated the Stipulation in the Debtor's First Amended Plan of Reorganization (the "Amended Plan") and it was described in the First Amended Disclosure Statement.[4] The First Amended Disclosure Statement was served upon all creditors and no creditor objected to the First Amended Disclosure Statement on the basis of the proposed treatment of the Foundation. This Court approved the First Amended Disclosure Statement on June 11, 1996.

On or about July 12, 1996, the Debtor filed and served on all creditors, including Rimco, a Notice Of Amendment To Chapter 11 Plan Of Reorganization, which incorporated the Stipulation into the Debtor's First Amended Joint And Consolidated Liquidating Plan Of Reorganization[5] (the "Joint Amended Plan").

4. The First Amended Disclosure Statement stated in relevant part:
 [Debtor] facilitated a tentative settlement of this matter by stipulating to $1,000,000 out of a $4,000,000 alleged claim, with the right of the Foundation to pursue a later increment to this claim depending on the outcome of the [Debtor's] liquidation efforts, and the [Debtor]

preserving [his] and other creditors right to dispute any further participation by the Foundation.

5. On May 14, 1996, this Court granted the Debtor's Motion for Joint Administration of his case with that of one of the Debtor's affiliated companies.

The Foundation and Rimco voted in favor of the Joint Amended Plan.

A hearing on confirmation of the Joint Amended Plan was held on July 17, 1996. At the hearing, Rimco did not object to the Joint Amended Plan's inclusion of the proposed settlement. However, the FDIC objected to confirmation of the Joint Amended Plan to the extent it effectuated approval of the Stipulation since some issues related to the Foundation's Claim were not completely resolved or disclosed. The Court confirmed the Joint Amend Plan, but the Stipulation was not approved. The Court required separate notice of the Stipulation be given to all creditors thereby giving creditors an opportunity to object to the terms of the Stipulation.

The Joint Amended Plan is a liquidating plan which provides for a pro rata distribution to the Debtor's unsecured creditors. The unsecured creditor's class consists of 21 creditors with allowed claims of $4,723,-317.00, excluding the Foundation's Claim. A procedure was established to provide a reserve for any distribution if the Foundation's Claim was subsequently allowed. To date, there have been only minimal distributions to the unsecured creditors under the Joint Amended Plan. The only significant asset available for distribution to the unsecured creditors is the proceeds of a claim the Debtor possess against MHM, Inc. (the "Ritchfield Litigation") which has not been resolved. Rimco, by its counsel, has stipulated that the only prejudice the estate or its creditors face with regard to the allowance of the Foundation's Claim is the diminution in distribution to the unsecured creditors.

On August 5, 1995, following confirmation of the Joint Amended Plan, the Debtor timely filed a Motion to Approve the Stipulation. The FDIC and Rimco both filed objections to the Stipulation. On September 25, 1996, a hearing was held on the Motion to Approve the Stipulation. Remington, Inc., another unsecured creditor, appeared at the hearing and joined in the objections to the Stipulation. The FDIC, Rimco, and Remington, Inc. comprise the three largest allowed unsecured creditors of the Debtor's estate.

At the hearing, the Debtor indicated that the dispute was between the Foundation and the unsecured creditors. The Debtor recommended approval of the Stipulation because litigation over this issue would be too expensive for the estate. However, Rimco indicated that it was willing to prosecute the objections to the Foundation's Motion on behalf of the estate without any expense to the estate. Based thereon, on September 27, 1996, the Court declined to approve the Stipulation and appointed Rimco as the Estate's representative to prosecute the objections to the Foundation's Motion. The Court also established a timetable for discovery and scheduled the Foundation's Motion for hearing.

## II. CONCLUSIONS OF LAW

### A. JURISDICTION

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding which the Court is authorized to hear, pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (O).

### B. EXCUSABLE NEGLECT

[1–3] Federal Rule of Bankruptcy Procedure 3003(c)(2) provides:

> **Who Must File.** Any creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.

Accordingly, the Foundation was required to file its proof of claim by the Claims Bar Date because the Debtor showed its claim as disputed on its amended schedules. However, Federal Rule of Bankruptcy Procedure 9006(b)(1) provides:

> Except as provided in paragraphs (2) and (3) of this subdivision, when an act is required or allowed to be done at or within a specified period by the rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion ... on motion made after the

expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

Therefore, this Court may allow a claim to be filed after the claims bar date "for cause". A creditor may be allowed to file a claim after the claims bar date for cause if the creditor demonstrates that its failure to file a timely proof of claim was the result of excusable neglect. *Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993); F.R.B.P. 3003(c)(3); F.R.B.P. 9006(b)(1). In *Pioneer,* creditors in a Chapter 11 bankruptcy case were allowed to file proofs of claim after the bar date because their attorney had been negligent by failing to timely file their claim. The Supreme Court found that the circumstances of the case warranted a finding of excusable neglect. The Supreme Court determined that the concept of neglect is "some what elastic" and could include "inadvertent delays." *Pioneer,* 507 U.S. at 394–95, 113 S.Ct. at 1498. According to the Supreme Court, the determination of whether excusable neglect is present is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* The Supreme Court determined that four factors are relevant when evaluating whether a claim may be accepted after the bar date as a result of excusable neglect. The four factors are:

> the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* In *Pioneer,* the Supreme Court found that these four factors supported a finding of excusable neglect.

### 1. Prejudice to the Debtor

The first *Pioneer* factor requires this Court to consider whether allowing the Foundation's claim will prejudice the Debtor. Rimco, on behalf of the estate, contends that the Debtor will be prejudiced because Debtor's Initial Plan, filed on December 7, 1995, was based upon the belief that the Debtor had resolved all claims issues. Rimco further argues that the unsecured creditors will be prejudiced by any diminution in their distributions under the Joint Amended Plan if the Foundation's Motion is granted. In response, the Foundation asserts that its claim was filed at almost the same time as the Initial Plan. The Foundation further notes that the First Amended Disclosure Statement and the Joint Amended Plan subsequently approved by the creditors both clearly referenced the Foundation's Claim and the pending settlement of the Foundation's Claim. According to the Foundation, when the creditors voted to approve the Joint Amended Plan, they were aware of the possibility that all or some portion of the Foundation's Claim might be paid.

The record reflects that no balloting or other steps toward confirmation of the Initial Plan ever took place. The Court further finds that there is no prejudice to the Debtor by granting the Foundation's Motion because the Joint Amended Plan was negotiated and confirmed after the Debtor and his creditors had notice of the Foundation's Claim. Furthermore, since the Joint Amended Plan is a liquidating plan providing for a pro rata distribution to the unsecured creditors, allowing the Foundation to file its claim after the Claims Bar Date does not prejudice the Debtor in any manner whatsoever. *In re Sacred Heart Hospital Of Norristown,* 186 B.R. 891 (Bankr.E.D.Pa.1995).

The only prejudice that *may* exist is to the unsecured creditors. However, the effect of a late filed known claim on unsecured creditors is not a relevant inquiry under *Pioneer. In re Eagle Bus Mfg.,* 62 F.3d 730, 737–39 (5th Cir.1995); *In re Smith,* 200 B.R. 135 (Bankr.S.D.Miss.1996). Any prejudice to the unsecured creditors arises from the amount of the claim itself and not because the claim was filed after the Claims Bar Date. Moreover, the creditors, including Rimco, voted in favor of the Joint Amended Plan with the knowledge of the existence of the Foundation's Claim and knowing that if this Court allowed the Foundation's Claim, their distributions under the Joint Amended Plan would be reduced. Accordingly, the Court finds that there is no prejudice to the Debtor's unsecured creditors by permitting

the late filing of the Foundation's Claim which would be sufficient grounds under *Pioneer* to deny the Foundation's Motion.

#### 2. The length of the delay and its potential impact on judicial proceedings.

The second *Pioneer* factor requires this Court to consider the length of the delay of filing the Foundation's Claim and its impact on judicial resources. The Foundation's Claim was filed almost seven months late. Rimco, in an effort to persuade this Court that seven months is an egregious delay, directs this Court to several cases where courts have not permitted a late filed claims where the delay was less than seven months. *See e.g., In re Alton,* 837 F.2d 457 (11th Cir.1988); *Ford Business Forms, Inc. v. Sure Card, Inc.,* 180 B.R. 294 (S.D.Fla.1994); *In re L. Meyer & Son Seafood Corp.,* 188 B.R. 315 (Bankr.S.D.Fla.1995). A review of these cases reveals that they have limited applicability to the instant case because they were decided before the Supreme Court's decision in *Pioneer* or concerned Chapter 7 bankruptcy cases. In *Pioneer,* the Supreme Court rejected the narrow meaning previously given to the term excusable neglect by the Eleventh Circuit and other Courts of Appeals. *Pioneer,* 507 U.S. at 386–88, 113 S.Ct. at 1494. The Supreme Court further stated that its flexible approach to excusable neglect under F.R.B.P. 9006(b) comported with the underlying policies of Chapter 11 which emphasize negotiation and reorganization rather than prompt liquidation and distribution of a debtor's estate. *Id.* at 388–90, 113 S.Ct. at 1495.

■ While seven months is a significant length of time, this delay did not delay the judicial proceedings of this case. The Court notes that subsequent to the Foundation's Motion, substantial issues in the case remained and were resolved by the Court. The late filing of the Foundation's Claim did not delay confirmation of the Joint Amended Plan and has not delayed the resolution of the Ritchfield Litigation. Furthermore, if the Foundation's Claim is permitted, no modification of the Joint Amended Plan is necessary since the plan provided for the contingency that the Foundation's Claim would be an allowed. Thus, the Court finds that there has not been, nor will there be, any significant disruption to the administration of the Debtor's bankruptcy case.

#### 3. The reason for the delay.

The third *Pioneer* factor the Court must consider is the reason for the delay in filing the Foundation's Claim. Rimco argues that the delay in filing the Foundation's Motion was due to the Foundation's intentional inaction and that discovery of the Claims Bar Date was within the Foundation's reasonable control. In support, Rimco points to the Foundation's knowledge of the Debtor's bankruptcy, its four million dollar claim, and repeated internal discussions on whether and when to file a claim. Rimco also points out that Ms. Rinder relied upon the VCIS even though Local Rule 503(A)[6] warns a party that it "should not rely exclusively on information derived from the automation systems but must verify the accuracy of the information from the original court papers in the court files." In Rimco's view, the Foundation should have been more diligent in its efforts to learn of the Claims Bar Date.

■ The Foundation's delay in filing the Foundation's Claim was due, in part, to the Debtor. As a result of the Debtor failing to include the Foundation on his original schedules and matrix, the Foundation was never sent the 341 Notice. The Court believes that if the Debtor had been more meticulous in his initial filings or had served the 341 Notice on the Foundation, any delay in the filing of the Foundation's Claim could have been avoided. *In re Eagle Bus Mfg.,* 62 F.3d 730, 739 (5th Cir.1995); *In re Arts Des Provinces De France, Inc.,* 153 B.R. 144, 147–48 (Bankr.S.D.N.Y.1993).

---

6. Local Rule 503(A) provides:

 **Automated Information Available.** Although public access to case and proceeding dockets, claims registers, hearing calendars, and certain other information maintained in the court's automation systems is available, no party should rely exclusively on information derived from the automation systems but must verify the accuracy of the information from the original court papers in the court files.

On the other hand, the Foundation is not entirely without fault. It is clear that the Foundation had notice of the Debtor's bankruptcy in early March 1995 when it received the Motion To Assume Lease. The Foundation also received the Amendment from the Clerk of the Court in late April or early May 1995. While neither of these pleadings provided actual notice of the Claims Bar Date, the Foundation was clearly on notice of the Debtor's bankruptcy filing prior to the Claims Bar Date.

The Foundation could have easily called the Court's VCIS prior to the Claims Bar Date. In addition, the Foundation's counsel should have reviewed the official court file after learning of the Debtor's bankruptcy and should have been more diligent in their efforts to learn of the Claims Bar Date and timely file the Foundation's Claim. However, the internal discussions at the Foundation establish that the Foundation's counsel reasonably believed that the Claims Bar Date had not been set and that when it was set, the Foundation would receive written notice of the Claims Bar Date. Moreover, Ms. Rinder was reasonably diligent in her efforts to learn of the Claims Bar Date and Mr. Mintz acted reasonably promptly in his efforts to see that the Foundation's Motion was filed as soon as practicable upon learning of the Claims Bar Date. Accordingly, the Court finds that, under the circumstances, the delay in filing the Foundation's Motion was inadvertent. *In re Earth Rock, Inc.*, 153 B.R. 61 (Bankr.D.Idaho 1993).

Furthermore, the Court finds that the Foundation was under the reasonable impression that a Claims Bar Date had not been established. This impression was created, in part, by misinformation the Foundation received from the Clerk's Office. The delay from September 22, 1995, when the Foundation discovered the Claims Bar Date to December 18, 1995, when the Foundation's Claim was filed, was in large part justified by the Foundation's efforts to ascertain all of the facts surrounding the Foundation's missing the Claims Bar Date and problems in obtaining a copy of the 341 Notice.

It is within this Court's discretion to determine whether the steps taken by the Foun-

dation were reasonable under the circumstances. Based upon the evidence presented, the Court finds that the Foundation acted reasonably under the circumstances presented by this case.

### 4. Whether the Foundation acted in good faith.

The final *Pioneer* factor requires this Court to assess whether the Foundation acted in good faith. Rimco asserts that the Foundation intentionally chose to wait to file a claim in order to learn the value of the Debtor's assets so it could determine whether its involvement in the case would be worthwhile. Rimco also asserts that the Foundation was concerned about submitting itself to the jurisdiction of this Court. Rimco characterizes the Foundation's inaction as an exercise of its business judgment which places its conduct in the realm of intentional omission. According to Rimco, this is evidence of bad faith which warrants denial of the Foundation's Motion.

The Court finds, however, that the record is devoid of any evidence that indicates bad faith on the part of the Foundation. While there were clearly discussions among personnel at the Foundation regarding the filing of a proof of claim, the Court does not find any evidence of either a tactical or intentional decision to refrain from filing a proof of claim. Mr. Mintz did not use his best professional judgment in delaying in filing a proof of claim as soon as he learned of the Debtor's bankruptcy. However, a careless mistake in professional judgment is not bad faith. *Pioneer*, 507 U.S. at 398–400, 113 S.Ct. at 1500; *In re Sacred Heart Hospital of Norristown*, 186 B.R. 891 (Bankr.E.D.Pa. 1995); *In re Earth Rock, Inc.*, 153 B.R. 61 (Bankr.D.Idaho 1993). Moreover, the Court finds that Mr. Mintz acted diligently after he learned of the passing of the Claims Bar Date. Therefore, the Court finds that the Foundation acted in good faith in filing the Foundation's Claim after the Claims Bar Date.

### C. CONCLUSION

Upon a review of the facts and circumstances surrounding the Foundation's failure

to timely file its claim and in light of the parameters set forth by the Supreme Court in *Pioneer,* this Court finds that the Foundation's failure to timely file its claim was the result of excusable neglect. Therefore, cause exists to grant the Foundation's Motion.

### ORDER

Based upon the foregoing, it is hereby **ORDERED and ADJUDGED** that:

1. This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334.

2. Pursuant to the factors established by the Supreme Court in *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd.* and in accordance with F.R.B.P. 9006(b)(1), the Foundation's failure to timely file its proof of claim in this bankruptcy case was the result of excusable neglect.

3. The Foundation's Motion for Enlargement of Time to File a Proof of Claim and for Order Accepting Claim as Timely Filed is Granted.

4. All objections to the Foundation's Motion for Enlargement of Time to File a Proof of Claim and for Order Accepting Claim as Timely Filed are Denied.

5. The time to object to the underlying merits of the Foundation's Claim shall be sixty (60) days from the date of this Order.

6. A separate Final Judgment shall be entered in conformity with F.R.B.P. 9021.

### FINAL JUDGMENT GRANTING MOTION OF JOHN D. AND CATHERINE T. MACARTHUR FOUNDATION FOR ENLARGEMENT OF TIME TO FILE A PROOF OF CLAIM.

**THIS MATTER** came before the Court for final hearing on December 18, 1996 on the John D. and Catherine T. MacArthur Foundation's (the "Foundation") Motion for Enlargement of Time to File a Proof of Claim and for Order Accepting Claim as Timely Filed and the objections thereto. The Foundation seeks permission to file a $4,000,000.00 unsecured claim almost 7 months after the claims bar date. The Court, having heard the testimony, examined the evidence presented, observed the candor and demeanor of the witnesses, and considered the arguments of counsel, enters the following Final Judgment. in conformity with F.R.B.P. 9021 and contemporaneously with this Court's Memorandum Decision And Order Granting Motion Of John D. And Catherine T. MacArthur Foundation For Enlargement of Time To File Proof of Claim. Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1. This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334.

2. Pursuant to the factors established by the Supreme Court in *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd.* and in accordance with F.R.B.P. 9006(b)(1), the Foundation's failure to timely file its proof of claim in this bankruptcy case was the result of excusable neglect.

3. The Foundation's Motion for Enlargement of Time to File a Proof of Claim and for Order Accepting Claim as Timely Filed is Granted.

4. All objections to the Foundation's Motion for Enlargement of Time to File a Proof of Claim and for Order Accepting Claim as Timely Filed are Denied.

5. The time to object to the underlying merits of the Foundation's Claim shall be sixty (60) days from the date of this Order.